## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL F. COOLBAUGH, | CASE NO. 3:12-cv-1889-CCC-GBC |
| Plaintiff, | (CHIEF JUDGE CONNER) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO<br>DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 7, 8, 13, 16 |

## REPORT AND RECOMMENDATION

### I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Michael F. Coolbaugh's application for supplemental security income ("SSI"). The ALJ concluded that Plaintiff was unable to perform his past relevant work given his age, education, and residual functional capacity ("RFC"). However, the ALJ concluded, on the basis of testimony from a vocational expert ("VE") that Plaintiff would be able to engage in other work in the national economy, such as a surveillance system monitor, order clerk, and tube operator.

The key issue in this case is whether Plaintiff's subjective symptoms, specifically pain, would interfere with his ability to remain on task for an entire work day. If Plaintiff was unable to remain on task, the vocational expert testified that Plaintiff would be unable to engage in work in the national economy.  In determining that Plaintiff's pain would not interfere with his ability to engage in a range of sedentary work, the ALJ made an adverse credibility determination and

assigned more weight to a consultative examining physician's opinion than Plaintiff's treating physician. The ALJ found that Plaintiff's subjective complaints of pain were not fully credible because he was able to engage in other strenuous or time-consuming activities, because medical records from the month before his hearing indicated that Plaintiff did not report any pain and indicated that he had "no" musculoskeletal symptoms, and because Plaintiff had failed to follow his physician's instructions to treat his pain. The ALJ found that the opinion from Dr. Clarence Mast, M.D., Plaintiff's treating physician, was not entitled to as much weight as the opinion of the consulting, examining physician because Dr. Mast's opinion contradicted Plaintiff's testimony, Dr. Mast's own treatment notes, and other medical evidence.

The Court reviews the ALJ's decision under the deferential substantial evidence standard, where the denial of benefits must be upheld if any reasonable mind could accept the evidence as adequate to conclude Plaintiff was not disabled.  Here, a reasonable mind could accept Plaintiff's self-reported activities, medical records indicating the absence of back pain, and Plaintiff's noncompliance with treatment to alleviate pain as adequate to find him not fully credible with regard to his subjective complaints. A reasonable mind could accept the contradictions between Dr. Mast's report and Plaintiff's testimony, Dr. Mast's treatment notes, and other medical evidence as adequate to assign more weight to the consultative physician. Accordingly, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff's subjective symptoms would not preclude him from performing a limited range of sedentary work. The Court recommends that Plaintiff's appeal be denied.

## II.    Procedural Background

On March 18, 2009, Plaintiff filed an application for SSI under Title XVI of the Social

Security Act. (Tr. 118-124). On October 14, 2009, the Bureau of Disability Determination[1] denied this applications (Tr. 80-85), and Plaintiff filed a request for a hearing on November 27, 2009.  (Tr. 88-90). On November 18, 2010, an ALJ held a hearing at which Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified (Tr. 49-78).   On January 3, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 11-26). On February 22, 2011, Plaintiff filed a request for review with the Appeals Council (Tr. 7-10), which the Appeals Council denied on August 13, 2012, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On September 21, 2012, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 20, 2012, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 7, 8). On March 4, 2013, Plaintiff filed a brief in support of his appeal ("Pl. Brief") (Doc. 13). On May 7, 2013, Defendant filed a brief in response ("Def. Brief") (Doc. 16). On April 30, 2014, the Court referred this case to the undersigned Magistrate Judge. On June 10, 2014, Plaintiff notified the Court that the case was fully briefed and ready for review. (Doc. 19).

## III.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v.

---

[1] The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

## IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520.  The Commissioner must sequentially

determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity (RFC).   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.   If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on January 26, 1965, and the regulations classified him as a "younger individual" at the time of his application and on the date of the ALJ's decision. 20 C.F.R. § 404.1563. (Tr. 65). Plaintiff has at least a high school education and past relevant work as a meat deboner and material handler. (Tr. 72, 139). Plaintiff had earnings for the years 1984 through 1997, and $2,184.00 of earnings in 2002, but stopped working altogether in 2002 when he "could not lift anymore" and had no subsequent earnings. (Tr. 127, 136, 279). Plaintiff reported that his pain began in 1990, when he was twenty-five years old. (Tr. 154).   Medical records show that Plaintiff suffered from degenerative disc disease and disc herniations in his back that remained

largely unchanged from 2002 through the decision date, but refused to follow his doctor's orders to take only the prescribed amount of medication, avoid loading or jumping out of trucks, and stop smoking, which was required for him to be able to undergo surgery to correct the problems in his back. Records submitted to the Appeals Council show that Plaintiff also refused to participate in physical therapy, wear his back brace, pursue vocational rehabilitation, or consider jobs that did not involve manual labor.

An MRI from May of 2002 indicated paracentral disc protrusion causing mild to moderate canal stenosis, a small hemangioma, and moderate degenerative disc disease. (Tr. 338-39). An MRI from January of 2003 indicated a large disc herniation, loss of disc height, and loss of signal. (Tr. 340). An MRI from May of 2004 again indicated disc herniation. (Tr. 344).

On October 31, 2008, Plaintiff was seen in the Guthrie Clinic by Aileen Colunio, FNP for a pain management consultation. Plaintiff reported that he had experienced pain from his back down into his legs since 1995, when he was working at a rock quarry. (Tr. 279, 348). Notes indicate that he stopped working in 2002. (Tr. 279). Plaintiff reported pain in his back, pain on extension, and "ambulate[d] with an antalgic gait, ambulating hunched over and having difficulty standing from the seated position or straightening out from bend over position of 45 degrees." (Tr. 279). Plaintiff reported that his pain was a 7/10 and that pushing, pulling and twisting worsened his pain. (Tr. 279). Plaintiff had no weakness or sensory deficits. (Tr. 279). Notes indicate that Plaintiff "has seen a neurosurgeon for his pain, though they will not do surgery until the patient stops smoking cigarettes." (Tr. 279). Ms. Colunio determined that "[t]here will be no intervention of pain management to offer this patient." (Tr. 279).

At visits with Dr. Mast on November 3, 2008 and November 11, 2008, Plaintiff's back was tender but his neurological exams were normal. (Tr. 217-18).

On January 8, 2009, Plaintiff followed-up with Ms. Colunio, who noted that Plaintiff "[t]ook more of his pain medications than prescribed." (Tr. 281). She noted Plaintiff was "[v]ery talkative patient [and] does not listen [so] unable to finish discussion." (Tr. 282). Ms. Colunio urged Plaintiff to stop smoking and "[d]iscussed the importance of smoking cessation [but Plaintiff] had numerous reasons why he can't quit." (Tr. 283)

On January 20, 2009, X-rays of Plaintiff's chest showed chronic changes, but no acute skeletal disease. (Tr. 232). They were suggestive of early changes of obstructive pulmonary disease, but there was no other evidence of acute disease. (Tr. 232). On the same day, he saw Dr. Mast reporting lower back pain. (Tr. 216). His back and neurological exams were within normal limits. (Tr. 216).

On February 11, 2009, Plaintiff saw Dr. Mast and complained of bilateral leg pain and being up at night. (Tr. 215). His back and neurological exams were within normal limits. (Tr. 215). On March 12, 2009, Plaintiff saw Dr. Mast to review test results. (Tr. 214). He reported back pain, but his back and neurological exams were within normal limits. (Tr. 214).

On March 18, 2009, Plaintiff filed an application for disability insurance benefits. (Tr. 118-124). Plaintiff asserted disability because he suffered from herniated disc and COPD which prevented him from lifting, twisting, or turning. (Tr. 136).

On April 10, 2009, Plaintiff saw Dr. Mast for a follow-up. (Tr. 213). His back and neurological exams were within normal limits. (Tr. 213). On May 12, 2009, Plaintiff saw Dr.

Mast for a check-up and medication change. His back and neurological exams were within normal limits, and the only symptom he reported was diarrhea. (Tr. 212).

On June 7, 2009, Plaintiff presented to the emergency room at Tyler Memorial Hospital. (Tr. 193). He was triaged as non-urgent, the lowest level. (Tr. 193). He reported that, at 6:30 p.m. the previous night, his back pain came on suddenly after he was bending and twisting while loading a rug into a van at a friend's house. (Tr. 189, 193). Plaintiff reported numbness in his feet and tenderness in his back with spasm and limited range of motion. (Tr. 193). Nursing notes indicate Plaintiff could get comfortable by changing his position. (Tr. 193). His straight leg raise, motor, sensory, and reflex exams were all normal. (Tr. 190). Plaintiff was given Toradol, Rebaxin, and Demoral and was discharged walking in stable condition. (Tr. 192, 194).

On June 12, 2009, Plaintiff had a follow-up from his emergency room visit with Dr. Mast. (Tr. 211). A review of Plaintiff's symptoms was negative, and his back and neurological exams were within normal limits. (Tr. 211). On July 7, 2009, Plaintiff had a check-up with Dr. Mast. (Tr. 210). His back and neurological exams were within normal limits, although his back was tender. (Tr. 210).

On July 10, 2009, Plaintiff submitted a Work History Report and Function Support in support of his application for benefits. (Tr. 146-155, 171-178). He reported that he had pain in his lower back and left leg that fluctuated in severity, was exacerbated by bending, standing, walking, and temperature change, but not sitting. (Tr. 154). Plaintiff reported that one or two Percacet every six hours relieved his pain for four to five hours. (Tr. 155).

Plaintiff reported that he cared for his children by pouring them milk and heating up meals with the assistance of his wife. (Tr. 147). He reported that he prepared microwave meals,

toast, and sandwiches. (Tr. 148). He reported that he shopped for food depending on what his family needs. (Tr. 149). He reported that he could drive sometimes. (Tr. 149). Plaintiff reported that, depending on hills, he could walk for 400-500 feet at a time before needing to rest for a minute or two. (Tr. 151). Plaintiff reported that he "often" plays with his children, watches TV, looks at wildlife, and plays cards with others. (Tr. 150).

He reported "not much" problems with bathing, shaving, and feeding himself, but indicated that bending was difficult, caring for his hair caused pain in his shoulders, and that he was at times unable to sit on the toilet. (Tr. 147). Plaintiff reported that he had no problem using his hands, talking, hearing, seeing, and getting along with others. (Tr. 151). He reported that he could only lift five pounds, could not squat, bend, or reach, that standing, walking, and climbing stairs hurt his legs, that sitting hurts his buttocks, that he was limited in kneeling because his back is hard to bend, and that he has problems with memory, completing tasks, concentration, understanding, and following instructions. (Tr. 151).

On August 13, 2009, Plaintiff was evaluated by Dr. Raphael Kon, M.D., a consultative examiner for the Bureau of Disability Determination. (Tr. 234). Dr. Kon observed that Plaintiff had "some" tenderness and a fifty percent decreased range of motion in his lumbar spine. (Tr. 236). Plaintiff had a positive straight leg raise test. (Tr. 237). Plaintiff also had decreased reflexes-1/4 in his elbows, wrists, and ankles and 2/4 in his knees. (Tr. 237). Dr. Kon opined that Plaintiff could carry and lift up to ten pounds occasionally, stand and walk for one to two hours out of an eight hour day and sit for six hours out of an eight hour day. (Tr. 238). Dr. Kon opined that Plaintiff could occasionally bend, kneel, stoop, and crouch but could never balance or climb. (Tr. 240).

On November 2, 2009 and December 2, 2009, Plaintiff followed-up with Dr. Mast complaining of pain, but his back and neurological exams were within normal limits. (Tr. 301-02).

On December 23, 2009, Plaintiff presented to the Guthrie Clinic for input on pain medications. (Tr. 284). Plaintiff ambulated with a "slightly" antalgic gait. (Tr. 286). Notes indicate that Plaintiff was "very vague and unsure as to what medication he is on and knows nothing in regard to any treatment he has received." (Tr. 284). Notes also indicate that:

> [Plaintiff] was seen in October 2008 and January 2009 <u>and had not followed any recommendations</u> and was told at that time that there was nothing further that could be offered on medication <u>with last exacerbation he took more pain medication than he was prescribed and was argumentative regarding this</u> he was told then not to jump off truck and continued to do so…Since that time <u>the patient has continue(s) to jump off the back of the truck even though he was given instructions not to do this anymore.</u>

(Tr. 286)(emphasis added).

On January 4, 2010, Plaintiff followed-up with Dr. Mast. (Tr. 303). His back and neurologic exams were within normal limits. (Tr. 303).

On January 11, 2010, Plaintiff had an MRI of his lumbar spine. (Tr. 270). It indicated that, since a prior study on May 20, 2004, the left-sided disc herniation at L4-5 had slightly decreased and the central disc herniation at L5-S1 had slightly increased, with no other changes. (Tr. 270).

On February 3, 2010, Plaintiff followed up with Dr. Mast complaining of a lot of pain in his left leg and buttock. (Tr. 307). However, when he followed up on March 4, 2010, his back exam was within normal limits. (Tr. 308).

On March 25, 2010, Plaintiff presented to the emergency room at Mercy Tyler Hospital. (Tr. 274). Plaintiff was triaged as non-urgent. (Tr. 274). Plaintiff reported that he "went on a long

trip" and that his back began hurting after he sat for two and a half hours. (Tr. 274).  Plaintiff was tender with limited range of motion, a positive straight leg raise on the left, and decreased reflexes in the left leg, but he had no associated symptoms like numbness or weakness. (Tr. 271, 274). Plaintiff received Robaxin and Toradol and was discharged in stable condition. (Tr. 275).

On April 7, 2010 and May 7, 2010, Plaintiff followed up with Dr. Mast. (Tr. 313-14). His review of symptoms was negative and his back exam and neurological exams were within normal limits. (Tr. 313-14). On June 7, 2010, he followed up with Dr. Mast and reported that his back was weak, but his neurological exam was within normal limits. On September 7, 2010, Plaintiff reported to Dr. Mast that he was feeling better with less pain, and his back and neurological exams were within normal limits. (Tr. 318).

On October 7, 2010, Plaintiff was evaluated for shortness of breath by Dr. Kim Norville, M.D., at the Guthrie Clinic. (Tr. 288). Plaintiff's respiratory exam was normal. (Tr. 290). Plaintiff's musculoskeletal exam was normal, Plaintiff had "no musculoskeletal symptoms," and his "[m]uscle strength, tone and movements are normal. Normal gait and station." (Tr. 290). Dr. Norville noted that his shortness of breath was likely secondary to his tobacco use, although it cardiac disease was possible. (Tr. 291). Plaintiff did not report back pain. (Tr. 288-291).

Plaintiff also followed-up with Dr. Mast on October 7, 2010. (Tr. 321). Plaintiff reported shortness of breath and chest discomfort, but did not report back or leg pain, and his back and neurologic exams were within normal limits. (Tr. 321). Plaintiff's toxicology labs were positive for morphine, opiates, and marijuana. (Tr. 322).

On October 8, 2010, Plaintiff was evaluated for chest pain at the Guthrie Clinic by Dr. Daniel Sporn, M.D. (Tr. 292). Plaintiff reported that he had shortness of breath and that his

physical activity was limited by his back issues. (Tr. 292). Dr. Sporn observed that a stress echocardiogram from September 10, 2010 was largely normal. (Tr. 292, 319). Plaintiff reported that he had "bouts where he will feel weak, fatigued." (Tr. 292). Plaintiff reported palpitations with activity, like mowing the lawn. (Tr. 293). Plaintiff's neurologic exam was normal. (Tr. 292). In his musculoskeletal exam, Plaintiff reported that he had "no" muscle pain, "no" muscle stiffness, but had episodes of muscle weakness and muscle cramping in his legs and hands. (Tr. 293). Plaintiff exercised for 7.5 minutes with no chest pain, which Dr. Sporn noted was "good exercise" without symptoms. (Tr. 296).

On October 15, 2010, Plaintiff had a pulmonary function test at the Guthrie Clinic. (Tr. 267). After six minutes of walking 1,080 feet, Plaintiff had normal oxygen saturation and his exercise tolerance was "good." (Tr. 267).  The report indicated that Plaintiff's borderline fixed airflow obstruction suggested chronic bronchitis. (Tr. 267). The impression did not list COPD or any other respiratory impairment. (Tr. 267). Plaintiff saw Dr. Norville to discuss the results the same day. (Tr. 298). Plaintiff had "no musculoskeletal symptoms." (Tr. 298). Plaintiff's respiratory and neurologic exams were normal. (Tr. 298). Dr. Norville again urged Plaintiff to quit smoking, and discussed "[o]ptions such as nicotine replacement, Wellbutrin, Chantix. The patient has tried Chantix in the past but had nightmares. He has opted to use nicotine patches. Importance of setting a quit date was stressed. He was not willing to set a quit date at this visit." (Tr. 298) (emphasis added).

On November 8, 2010, Plaintiff followed-up with Dr. Mast. (Tr. 326). Plaintiff reported that his back pain persisted and he had tenderness in his spine, but his back and neurologic exams were within normal limits. (Tr. 326).

On November 18, 2010, the ALJ held a hearing on Plaintiff's application for benefits. Plaintiff testified that his pain was "pretty constant" in his back and leg. (Tr. 58). Plaintiff testified that he had to sit forward because he gets severe back pains when he coughs. (Tr. 58). Plaintiff testified that he could only stand for one minute before needing to move, and could only move around for four or five minutes. (Tr. 59). Plaintiff explained that he could not get surgery to alleviate his pain until he stopped smoking. (Tr. 60). He testified that he had refused to continue medication, identified in the medical records as Chantix (Tr. 298), because it gave him nightmares. (Tr. 60). He indicated that he was on the patch, and that it was helping "a little." (Tr. 60).

Plaintiff testified that, during the day, he watches TV, but "mostly sleep[s]." (Tr. 66). He testified that he does not visit friends, go out to dinner, attend church activities, or go to social activities. (Tr. 66).Plaintiff admitted that he was able to drive when he had to, and that he drove part of the way to the hearing because his wife does not like to drive in traffic. (Tr. 63). However, when asked if he did any household chores, he explained that he does not "have to really do anything anymore" because his children and wife do them. (Tr. 63).

The ALJ elicited testimony from the VE regarding two hypotheticals. First, the ALJ asked the VE whether a claimant who could engage in sedentary work, with a sit/stand option every half hour, only occasional bending, balancing, stooping, kneeling, crouching, crawling, and climbing and never working on ladders, ropes, scaffolds, unprotected heights, temperature extremes, wetness, or humidity, and limited to work at jobs with are simple and routine with no more than an SVP of 2 could engage in work in the national economy. (Tr. 73). The VE testified that such a claimant could work as a surveillance system monitor, a courier, or an order clerk.

(Tr. 74). Second, the ALJ asked the VE whether a claimant with the same limitations, but also would be off task secondary to pain up to twenty percent of the work day, could engage in work in the national economy. (Tr. 74). The VE testified that such a claimant could not engage in any work. (Tr. 74). The ALJ explained that, the ultimate question was whether Plaintiff could engage in the limited range of sedentary work described in the first hypothetical or was limited to the second hypothetical as a result of his subjective symptoms of pain. (Tr. 75).

On December 1, 2010, Dr. Mast completed an opinion report. Under "clinical findings," he noted Plaintiff's tender spine with difficulty bending, walking, and sitting. (Tr. 359). Dr. Mast opined that Plaintiff could only occasionally lift and carry ten pounds and could never lift or carry more than ten pounds. (Tr. 360). Dr. Mast opined that Plaintiff could sit, stand or walk for one hour without interruption, but could only sit for a total of two hours out of the day, stand for a total of two hours out of the day, walk for a total of two hours out of the day, and had to lie down in a supine position for the remaining two hours of an eight hour workday. (Tr. 361). Dr. Mast opined that Plaintiff did not need a cane to ambulate, but did have difficulty ambulating. (Tr. 361). When asked to identify the particular medical or clinical findings that support these observations, Dr. Mast wrote "see enclosure." (Tr. 361). Dr. Mast opined that Plaintiff could never perform any activity with either of his hands, including reaching, handling, fingering, feeling, pushing and pulling and could never operate foot controls. (Tr. 362). When asked to identify the particular medical or clinical findings that support these observations, Dr. Mast wrote "see enclosure." (Tr. 362). Dr. Mast did not express any opinion as to Plaintiff's ability to engage in postural activities like climbing, balancing, stooping, kneeling, crouching or crawling. (Tr. 363).

Dr. Mast opined that Plaintiff could not perform activities like shopping, could not travel without a companion for assistance, could not walk a block at a reasonable pace on rough or uneven surfaces, could not climb a few steps at a reasonable pace with the use of a single hand rail, and could not prepare simple meals to feed himself. (Tr. 365). When asked to identify the particular medical or clinical findings that support these observations, Dr. Mast wrote "see enclosure." (Tr. 365). Although Dr. Mast wrote "see enclosure," the final page of his nine page report was the end of Exhibit 17F. (Tr. 29, 366). The next page in the transcript is exhibit 18F, which begins the portion of the medical records that were submitted to the Appeals Council but not submitted to the ALJ. (Tr. 4). Consequently, there is no enclosure in the record.

The ALJ issued a decision on January 3, 2011. At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since February 25, 2009, the application date. (Tr. 16, Finding 1). At step two, the ALJ found that Plaintiff's degenerative disc disease of the lumbar spine with herniation, chronic obstructive pulmonary disease, nicotine abuse and Lyme's Disease were medically determinable and severe impairments. (Tr. 16, Finding 2). However, the ALJ found that Plaintiff's depression was nonsevere. (Tr. 16, Finding 2). At step three, the ALJ considered the Listings in section 1.04, Disorders of the Spine, and found that Plaintiff's spine impairment did not meet any of the Listings. (Tr. 17-18, Finding 3). The ALJ also considered the Listings in sections 3.00 et seq, Respiratory Disorders, and 11.00 et seq., Neurological Disorders, and found that Plaintiff's impairments did not meet any of the Listings. (Tr. 18, Finding 3).

Prior to proceeding to step four, the ALJ assessed Plaintiff's RFC, and found that Plaintiff can engaged in a limited range of sedentary work, with a sit/stand option every half hour, only occasional bending, balancing, stooping, kneeling, crouching, crawling, and climbing

and never working on ladders, ropes, scaffolds, unprotected heights, temperature extremes, wetness, or humidity. (Tr. 18, Finding 4). The ALJ limited Plaintiff to work at jobs with are simple and routine with no more than an SVP of 2. (Tr. 18, Finding 4).

The ALJ concluded that Plaintiff could not engage in his past relevant work (Tr. 21, Finding 5), but that he could engage in work in the national economy based on his RFC, age, and education. (Tr. 21-22, Finding 6-9). Specifically, the ALJ found that Plaintiff could work as a surveillance system monitor, order clerk, or courier. (Tr. 22, Finding 9). As a result, the ALJ concluded that Plaintiff was not disabled and was not entitled to benefits. (Tr. 22, Finding 10).

## VI.     Plaintiff Allegations of Error

### A.     The ALJ's assignment of weight to the medical opinion evidence

The ALJ assigned little weight to the opinion of Dr. Mast because Dr. Mast's opinion was based entirely on Plaintiff's decreased range of motion and subjective complaints of pain. The ALJ specifically rejected Dr. Mast's limitations on Plaintiff's upper extremities and posture because they were inconsistent with objective evidence, Plaintiff's testimony, and the absence of weakness, atrophy, or neurological dysfunction in Dr. Mast's report. (Tr. 20, Finding 4). The ALJ acknowledged that Plaintiff had decreased range of motion, muscle spasm and positive straight leg raise tests on the left. (Tr. 21, Finding 4). However, the ALJ found that Plaintiff's impairments did not preclude him from sedentary work because he had no neurological deficits and no decrease in strength. (Tr. 21, Finding 4)(citing Tr. 233-243 and Tr. 278-298). The ALJ also noted that Plaintiff's treatment had comprised "almost entirely" of narcotics and that there was no "hard evidence of a worsening of his condition." (Tr. 21, Finding 4).

The ALJ assigned great weight to the opinion of the consultative examiner, Dr. Kon, that despite Plaintiff's tenderness and decreased range of motion, Plaintiff could lift and carry up to ten pounds, stand or walk for two hours out of an eight hour workday and sit for six hours out of an eight hour work day, with limitations in pushing, pulling, bending, kneeling, stooping, and crouching. (Tr. 20, Finding 4). The ALJ gave little weight to Dr. Kon's opinion that Plaintiff can never balance or climb because Plaintiff testified that he lives in a two-story home and can climb steps and because there is "nothing in the evidence suggesting the claimant has difficulty with balancing." (Tr. 20, Finding 4).

An ALJ must determine the weight to be given to medical opinions in making RFC assessments. The Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R.   § 416.927(d)(2).   When the opinion is inconsistent with other evidence, 20 C.F.R. §404.1527(c) establishes the factors to be considered by the ALJ. Under 20 C.F.R. §§404.1527(c)(1) and (2), the opinions of treating physicians are generally given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians when all other factors are equal. 20 C.F.R. §404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship.   20 C.F.R. §404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §404.1527(c)(5) provides more weight to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to

support or contradict the opinion." When there are multiple medical opinions, "it is clearly within the ALJ's statutory authority to choose whom to credit" but "the ALJ "cannot reject evidence for no reason or the wrong reason." <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir. 1993) (citing <u>Cotter v. Harris,</u> 642 F.2d 700, 707 (3d Cir.1981)). Internal inconsistencies and inconsistencies with a physician's own treatment record are acceptable reasons for rejecting a treating physician's opinion. <u>Plummer v. Apfel</u>, 186 F.3d 422, 430 (3d Cir. 1999).

Plaintiff asserts that the ALJ improperly concluded that Dr. Mast's opinion was unsupported by objective clinical findings (Pl. Brief at 19) and improperly relied on his personal interpretation of radiology studies (Pl. Brief at 14-15). However, the Court finds that he ALJ properly concluded that Dr. Mast did not indicate any clinical findings aside from Plaintiff's tenderness and difficulty with range of motion. Dr. Mast referred to an enclosure to justify his findings, but no enclosure was attached. (Tr. 358-366).

More importantly, Plaintiff does not challenge the ALJ's conclusion that Dr. Mast's opinion conflicts with Plaintiff's testimony, Dr. Mast's treatment notes, and other medical evidence. Each of these are acceptable reasons to discount the opinion of a treating physician, particularly where there is a competing opinion by an examining physician. <u>Plummer v. Apfel</u>, 186 F.3d 422, 430 (3d Cir. 1999).

Dr. Mast's opinion conflicted with Plaintiff's testimony. For instance, Dr. Mast opined that Plaintiff could "never" perform any action with his hands. (Tr. 362). However, in Plaintiff's Function Report, he indicated that he had no problem with his hands. (Tr. 151). Dr. Mast opined that Plaintiff could sit for no more than an hour at a time, but Plaintiff reported to his treating providers that he "went on a trip" and sat in the car for two and half hours. (Tr. 275 ). Plaintiff

also reported in his Function Report that taking one to two Percocet "relieve[d]" his pain, and that the relief lasted for four to five hours. (Tr. 155).  Dr. Mast opined that Plaintiff could not perform activities like shopping, could not travel without a companion for assistance, could not walk a block at a reasonable pace on rough or uneven surfaces, could not climb a few steps at a reasonable pace with the use of a single hand rail, and could not prepare simple meals to feed himself. (Tr. 365). However, in Plaintiff's function report, he indicated that he could go shopping for food, depending on what his family needed, that he could walk 400-500 feet without stopping, and prepared simple meals. (Tr. 147-49).  Plaintiff testified that he could drive when he had to. (Tr. 63 ). As a result, Dr. Mast's opinion conflicted with Plaintiff's reports and testimony.

Dr. Mast's opinion conflicted with his treatment notes. Dr. Mast's treatment notes repeatedly indicate that Plaintiff's back and neurologic exam was within normal limits ("WNL"). For instance, on January 20, 2009, February 11, 2009, March 12, 2009, June 12, 2009, March 4, 2010, April 7, 2010, May 7, 2010, and September 7, 2010, Dr. Mast's notes indicate that a review of Plaintiff's symptoms was negative and that his back and neurological exams were within normal limits ("WNL"). (Tr. 210-216, 308, 313-14, 318). On  July 7, 2009, Dr. Mast's notes indicate that Plaintiff's back was tender, but his back and neurological exams were still within normal limits. (Tr. 210). On February 3, 2010, Plaintiff complained of pain in his left leg and buttock, but these complaints had resolved by his next follow-up on March 4, 2010. (Tr. 307-08). Plaintiff reported on June 7, 2010, that his back was "weak," but his neurological exam was normal and by September 7, 2010, Plaintiff reported to Dr. Mast that he was feeling better with less pain, and his back and neurological exams were within normal limits. (Tr. 318). Dr.

Mast's treatment notes do not indicate any objective findings, such as positive straight leg raises, muscle spasms, or physical abnormalities, and only indicate tenderness or pain sporadically.

Dr. Mast's opinion conflicted with other substantial medical evidence. At Plaintiff's October 7, 2010 appointment with Dr. Norville, Plaintiff reported that he had "no musculoskeletal symptoms," and his "[m]uscle strength, tone and movements are normal. Normal gait and station." (Tr. 290). Plaintiff did not report back pain. (Id.). At Plaintiff's October 8, 2010 appointment with Dr. Sporn, Plaintiff reported that he had "no" muscle pain, "no" muscle stiffness, but and no muscle weakness or muscle cramping in his back. (Tr. 293). Plaintiff exercised for 7.5 minutes on October 8, 2010 and for 6 minutes on October 15, 2010, covering 1,080 feet, without symptoms. (Tr. 267, 296). At Plaintiff's October 15, 2010 appointment with Dr. Norville, Plaintiff had "no musculoskeletal symptoms." (Tr. 298). Plaintiff did not report back pain. (Id.). The ALJ specifically acknowledged and cited to these records in concluding that Dr. Mast's opinion was inconsistent with the weight of the evidence. (Tr. 19-20).

In a similar case, the Third Circuit upheld the determination by an ALJ that the opinion of a treating physician was entitled to little weight:

> The opinions offered by Jones's treating physicians were conclusory and unsupported by the medical evidence, and failed to explain why ailments that had plagued Jones for decades did not incapacitate him until 1987. Further, these opinions were not uncontradicted. After Jones applied for reconsideration of the initial rejection of his claim, two physicians in the state agency evaluated the medical findings of Jones's treating physicians and concluded that those findings did not reveal any condition that would preclude gainful employment. In light of such conflicting and internally contradictory evidence, the ALJ correctly determined that the opinions of Jones's treating physicians were not controlling.

Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (citing Wright v. Sullivan, 900 F.2d 675, 683 (3d Cir.1990); Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir.1985)).

Even assuming Plaintiff was correct in asserting that the ALJ improperly relied on radiology studies, the ALJ also justified his assignment of weight to Dr. Mast by pointing to contradictions between Dr. Mast's opinion and Plaintiff's testimony, Dr. Mast's treatment notes, and the medical evidence from October of 2010 where Plaintiff reported no musculoskeletal symptoms and no back pain. A reasonable mind could accept this evidence as adequate to assign little weight to Dr. Mast's significantly more overstated opinion of disability. Thus, substantial evidence supports the ALJ's assignment of little weight to Dr. Mast's opinion.

### B.    The ALJ's credibility assessment

The ALJ found that Plaintiff's complaints were not fully credible because objective evidence failed to support the severity of his symptoms, Plaintiff was seen in the emergency room multiple times after engaging in strenuous and time consuming activities, and exams from October 2010 indicated normal muscle tone, strength, movement, gait, and auscultation of his lungs. (Tr. 19-20, Finding 4) (citing Tr. 193, 232, 267, 270, 274, 290, 292, 299, 346). The ALJ noted that Plaintiff testified that he "drove ½ way to the hearing because his wife doesn't like to drive in traffic."(Tr. 19). The ALJ noted that Plaintiff "testified at the hearing that he is able to play games with his four daughters, go to the store, visit with his father, prepare small meals and do minor household chores." (Tr. 19, Finding 4). The ALJ also noted that "[t]he claimant reported that he enjoys looking at wildlife, playing cards, and watching television." (Tr. 19, Finding 4) (citing Tr. 150).

The ALJ cited to numerous examples when Plaintiff failed to follow his doctor's orders. The ALJ noted that Plaintiff would be eligible for surgery if he quit smoking, but "[d]espite [Plaintiff's] complaints of intolerable pain, he has not quit smoking." (Tr. 20, Finding 4). The

ALJ also specifically cited to several records from Tyler Memorial Hospital documenting Plaintiff's non-compliance. Those records indicated that Plaintiff "does not listen" and had "numerous reasons why he can't quit" smoking. (Tr. 283). One record cited by the ALJ sums up Plaintiff's history of treatment at the hospital:

> [Plaintiff] was seen in October 2008 and January 2009 <u>and had not followed any recommendations</u> and was told at that time that there was nothing further that could be offered on medication <u>with last exacerbation he took more pain medication than he was prescribed and was argumentative regarding this</u> he was told then not to jump off truck and continued to do so…Since that time <u>the patient has continue(s) to jump off the back of the truck even though he was given instructions not to do this anymore</u>.

(Tr. 286)(emphasis added).

Plaintiff asserts that the ALJ failed to properly consider Plaintiff's complaints of pain (Pl. Brief at 19). Plaintiff asserts that "[t]he ALJ improperly rejected all of the Plaintiff's testimony concerning his chronic pain without explanation." (Pl. Brief at 20). "The ALJ makes generalized statements that reject the Plaintiff's testimony but fails to properly identify medical evidence supporting his rejection." (Pl. Brief at 20). Defendant responds that "20 C.F.R § 416.929(c)(3)… permits the ALJ to consider whether there are inconsistencies between a claimant's statements regarding the intensity of his symptoms and the rest of the evidence." (Def. Brief at 18).

An ALJ must consider several factors contained in the regulations for evaluating credibility, including a claimant's activities of daily living. SSR 96-7p (citing 20 CFR §§404.1529(c), 416.929(c)). Failing to seek and follow-through with treatment can be a basis for an adverse credibility finding:

> In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and <u>to follow that treatment once it is prescribed</u> lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as

by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

On the other hand, the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.

SSR 96-7p (emphasis added). The Third Circuit has cited SSR 96-7p favorably:

Vega contends that this determination was improperly based on evidence that she had not been compliant with her prescribed treatment plan. It is true, as Vega asserts, that the ALJ referred to evidence of Vega's noncompliance in his findings. It is also true that a denial of benefits for failure to follow a prescribed treatment plan may only be issued after the ALJ finds a disabling impairment that precludes engaging in any substantial activity, SSR 82–59, a finding that the ALJ did not make here.

However, it was not Vega's noncompliance with her treatment that was the basis for the denial of benefits; rather, it was her residual functional capacity to return to sedentary work. Viewed in the context of the ALJ's findings as a whole, his reference to Vega's noncompliance shows that he treated it as a factor in analyzing the credibility of Vega's testimony. Because an ALJ may consider a claimant less credible if the individual fails to follow the prescribed treatment plan without good reason, *see* SSR 96–7p, this was not improper.

Vega v. Comm'r of Soc. Sec., 358 F. App'x 372, 375 (3d Cir. 2009).

Thus, it was proper for the ALJ to base a credibility finding on Plaintiff's noncompliance. Plaintiff has not challenged the ALJ's conclusion that he failed to follow his doctor's treatment orders. The ALJ also specifically cited to strenuous and time-consuming activities of daily living in discounting Plaintiff's credibility. This is another proper justification for an adverse credibility finding. SSR 96-7p ("[T]he adjudicator must consider…[t]he individual's daily activities" when making a credibility assessment.).

The ALJ accommodated for most of Plaintiff's limitations, but did not include Plaintiff's claimed limitations caused by his subjective symptoms of pain, such as an inability to sit for a prolonged period of time. Plaintiff ultimately bears the burden of providing disability within the meaning of the Act. The only evidence produced by Plaintiff of these limitations was Dr. Mast's opinion and his testimony. However, the ALJ properly rejected Dr. Mast's opinion in favor of Dr. Kon's opinion and properly found Plaintiff to be less than credible. No evidence remains in support of Plaintiff's claimed limitations as a result of subjective symptoms. As a result, Plaintiff failed to meet his burden and substantial evidence supports the ALJ's decision denying benefits.

## C.     Bias

Plaintiff asserts the ALJ exhibited bias because he mischaracterized Plaintiff's testimony and because he failed to obtain additional information from Dr. Mast. Specifically, Plaintiff asserts that the ALJ exhibited bias because he characterized Plaintiff's testimony as driving "1/2 way to the hearing," when, according to Google Maps, Plaintiff only drove for 9.6 miles out of a 51.7 mile drive. (Pl. Brief at 22). Plaintiff also asserts that the ALJ "misrepresented the Plaintiff's daily activities" because Plaintiff's testimony "clearly indicates that he is severely limited in his ability to do anything around the home." (Pl. Brief at 23). Defendant responds that, the testimony identified by the ALJ that Plaintiff played games with his daughters, went shopping, visited with his father, prepared small meals, and performed minor household chores, drive a car, go on prolonged car trips, and loaded a rug into his van supports his characterization of Plaintiff's testimony. (Def. Brief at 14).

The Court finds that the ALJ's characterization of testimony does not suggest bias. Although Plaintiff claims he did not drive "1/2 way" to the hearing, he still drove a significant

portion of the way, which undermines his claim that he cannot sit for more than a few minutes. Similarly, the Court finds that the ALJ properly characterized Plaintiff's activities, particularly the activities reported to his treating providers that he was continuing to jump out of his truck and taking "trips" of two to three hours. Moreover, nothing about these characterizations suggests bias.

Plaintiff asserts that the ALJ also exhibited bias because ALJ did not contact Dr. Mast for further explanation of his opinion and did not direct the Plaintiff to contact Dr. Mast for further explanation of his opinion. (Pl. Brief at 24). Defendant responds that "[t]he regulations state that an ALJ may recontact a treating source if there are inconsistencies in the evidence that an ALJ cannot resolve, or the evidence is insufficient to determine whether a claimant is disabled. See 20 C.F.R. § 416.920b(c)(1)." (Def. Brief at 16).

The Court finds that the ALJ did not need to recontact Dr. Mast because the ALJ rejected his opinion for a variety of reasons, not just the lack of clinical findings or explanation. The ALJ also rejected Dr. Mast's opinion because it conflicted with Plaintiff's testimony, his own treatment notes, and medical records from the month before the hearing when Plaintiff had no musculoskeletal pain. Additional explanation would not resolve these conflicts. Moreover, the ALJ had sufficient evidence to determine that Plaintiff is not disabled because Dr. Kon opined Plaintiff could engage in a limited range of sedentary work, Plaintiff refused to follow his treatment plan, and Plaintiff engaged in other time-consuming and strenuous activities despite his complaints of disabling pain. 20 C.F.R. § 416.920b(c)(1). As a result, the ALJ did not need to recontact Dr. Mast and his failure to recontact Dr. Mast does not suggest bias.

## D.      Records not before the ALJ

Plaintiff submitted a variety of documents to the Appeals Council and the Court that were not before the ALJ. (Tr. 367-462). When the Appeals Council denies review, the only way for the Court to consider records that were not before the ALJ is in the context of a remand pursuant to sentence six of 405(g), 42 U.S.C. ("sentence six remand"). The Third Circuit explains that:

> As amended in 1980, § 405(g) now requires that to support a "new evidence" remand, the evidence must first be "new" and not merely cumulative of what is already in the record. Second, the evidence must be "material;" it must be relevant and probative. Beyond that, the materiality standard requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination. An implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition. Finally the claimant must demonstrate good cause for not having incorporated the new evidence into the administrative record.

Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984) (internal citations omitted). However, Plaintiff has not asserted that these records are new, material, and omitted without good cause.

Many of the records relate to the period between 2002 and February of 2005. (Tr. 367-405). These records are not material because they do not relate to the relevant period. Moreover, the records are not material because they raise no possibility the ALJ would have changed his mind. For instance, a neurosurgery consultation from September of 2004 with Dr. Bruce Wilder, M.D., notes Plaintiff was less likely to benefit from surgery because he refused to quit smoking. (Tr. 387). Dr. Wilder also noted that "he should direct his work efforts toward something that was not going to provide day in and day out stress on his lower back, such as working in the stone quarry. I did make him aware of state vocational services but I am not certain he is well motivated to follow this path." (Tr. 387) (emphasis added).  On February 24, 2005, the record

indicates that he was refusing to go to physical therapy because it made his back hurt. (Tr. 393). He also refused to wear his brace or to consider jobs that did not involve manual labor. (Tr. 393).

Plaintiff also submitted additional records from visits with Dr. Mast in 2010 and 2011. For the records that existed prior the ALJ's decision, there is no good cause for their omission. Moreover, they would not cause the ALJ to change his opinion, because they showed that Plaintiff had back and neurologic exams within normal limits on January 4, 2010, (Tr. 429), October 7, 2010 (Tr. 436), November 8, 2010 (Tr. 437), December 1, 2010 (Tr. 438), and December 30, 2010. (Tr. 439). Plaintiff submitted medical records from various providers from visits that occurred after the ALJ's decision, but these records are not material because they do not relate to the relevant period. (Tr. 418-427, 440-48, 451-53). The remaining additional records (Tr. 406-07, 416,  430-33, 435, 454-464) are duplicates of records that were before the ALJ. (Tr. 232,  270, 282-96, 307-08, 313-14, 318).

There is one medical record that is potentially new, omitted from the record before the ALJ with good cause, and relates to the relevant time period. On January 3, 2011, Plaintiff was evaluated for an increase in his pain medications, (Tr. 408). Notes from this visit indicate that he quit smoking in December of 2010, about a week before the ALJ's decision. (Tr. 408). However, in order to be material, a record needs to both relate to the relevant time period and raise a reasonable possibility that the ALJ would have decided differently. This single record raises no such possibility.  Throughout the relevant period, the record is replete with Plaintiff's refusal to follow his doctor's orders to treat his pain. The ALJ properly concluded that this refusal suggested that Plaintiff's pain was not as severe as he claimed. Plaintiff's report that he quit smoking during the last week of the relevant period does not undermine the ALJ's conclusion

that Plaintiff's pain was not as severe as he claimed for the requisite twelve months during the relevant time period. Although Plaintiff's compliance with his doctor's orders may suggest that, at the end of the relevant period, his pain was more severe, the proper remedy for a claimant with a deteriorating condition is to file a new application. Sizemore v. Secretary of Health and Human Services, 865 F.2d 709, 712 (6th Cir.1988) (Plaintiff should "initiate a new claim for benefits as of the date that the condition aggravated to the point of constituting a disabling impairment"). Moreover, Plaintiff bears the burden of establishing that he is entitled to a remand under sentence six, but has neither alleged nor established that this record raises a reasonable probability the ALJ would have decided differently. Thus, the Court concludes that a sentence six remand is inappropriate, and did not consider the above-described records, including Plaintiff's smoking cessation, in reviewing whether substantial evidence supports the ALJ's decision.

## VII.   Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands.

<u>Monsour Med. Ctr.</u>, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: August 11, 2014                              _____
                                                                s/Gerald B. Cohn
                                                            GERALD B. COHN
                                                UNITED STATES MAGISTRATE JUDGE